Filed 7/15/13  P. v. Morrow and Knox CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>DAMIEN MORROW and<br>PHILLIP A. KNOX,<br><br>  Defendants and Appellants. | B236173<br><br>(Los Angeles County<br> Super. Ct. No. KA088751) |

APPEALS from judgments of the Superior Court of Los Angeles County, Carol Williams Elswick, Judge.  Affirmed.

Koryn & Koryn and Daniel G. Koryn, under appointment by the Court of Appeal, for Defendant and Appellant Damien Morrow.

David H. Goodwin, under appointment by the Court of Appeal, for Defendant and Appellant Phillip A. Knox.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

The prosecution charged Damien Morrow, Phillip Knox and Traveon Taylor with committing multiple sexual assaults on Jane Doe while acting in concert. The three defendants were jointly tried but, because of potential *Aranda-Bruton*[1] issues, two juries were empanelled. One jury (the orange jury) determined the case against Morrow and Knox; the other jury (the green jury) determined the case against Taylor. Knox and Taylor testified in front of both juries and claimed that Doe had consented. The defense theory of the case, as set forth in each defendant's closing argument, was that Doe had agreed to sexual relations with all three men and that her testimony to the contrary was a lie.

Following a seven-week trial, the orange jury convicted Morrow and Knox, appellants herein, of three counts each. Morrow was convicted of sexual penetration by a foreign object (fingers) while acting in concert (§§ 264.1 & 289, subd. (a)),[2] forcible rape while acting in concert (§§ 264.1 & 261, subd. (a)(2)), and attempted forcible rape while acting in concert (§§ 664/264.1 and 664/261, subd. (a)(2).) Knox was convicted of forcible rape while acting in concert (§§ 264.1 & 261, subd. (a)(2)), attempted forcible rape while acting in concert (§§ 664/264.1 and 664/261, subd. (a)(2), and forcible oral copulation while acting in concert (§ 288a, subd. (d)(1).) However, the green jury acquitted Taylor of all charges.[3]

---

[1]     *People v. Aranda* (1965) 63 Cal.2d 518 and *Bruton v. United States* (1968) 391 U.S. 123.

[2]     All undesignated statutory references are to the Penal Code unless stated otherwise.

[3]     Morrow and Knox do not contend that Taylor's acquittal is a sufficient basis by itself to set aside the verdicts rendered against them.

The trial court sentenced Morrow to a term of 12 years and four months and Knox to a term of 17 years and four months.

In these appeals, Morrow and Knox raise multiple contentions of evidentiary and instructional error as well as claims of prosecutorial misconduct. In addition, Knox contends that the evidence is insufficient to support his conviction for forcible oral copulation and Morrow contends that the trial court improperly sentenced him to consecutive terms. We find no prejudicial error occurred and therefore affirm the judgments.

## STATEMENT OF FACTS

### A.  The Prosecution's Case

1. *Background Information*

At the time of these events, Doe was 18 years old and lived at home with her parents. Taylor and Knox are half-brothers and shared the apartment where the crimes occurred. Laron "Scooter" Taylor (Scooter)[4] is a cousin of Taylor and Knox and was temporarily living with them when Doe was assaulted.

At some time during September 2009, Doe and Eboni White (White) met Morrow.[5] Doe and Morrow became platonic friends, often communicating through instant messaging on their respective cell phones. Through Morrow, Doe met Knox, Taylor and Scooter. Doe never dated any of these men. Doe visited Morrow several times at Knox and Taylor's apartment.

---

[4]     We refer to Laron Taylor by his nickname Scooter to avoid confusion with co-defendant Traveon Taylor.

[5]     Unless otherwise stated, all of the facts set forth in "The Prosecution's Case" are gleaned from Doe's testimony.

3

On November 9, Doe and Morrow visited defendants' apartment with Doe's friend Esteffania Ocampo for a couple of hours.  No sexual encounters occurred.

2. *Doe's Consensual Encounters with Defendants on November 10*

On November 10, Morrow sent Doe an instant message, asking her to come over to Knox and Taylor's apartment.  When Doe arrived around 7:30 p.m., Morrow, Knox, Taylor, Scooter and Scooter's girlfriend Paula Carlos were present.

After conversing with Morrow in the living room, Doe went with him to Taylor's bedroom to wrestle.  At some point, Taylor entered the bedroom.  He joined Doe and Morrow in wrestling but left after awhile.  Doe and Morrow stayed, conversing with each other.  Doe received a phone call.  While on the phone, Morrow "was like biting on [her] private area" in a "playful" manner.  After Doe finished her phone call, she and Morrow resumed wrestling.  Morrow called for Taylor to join them.  He did and the three of them again wrestled in a playful manner.  After approximately 10 minutes, they stopped and went into the living room.  There, Doe and Taylor again wrestled.  Taylor called for Knox to join them.  He did.  At one point, Taylor and Knox, "in a playful fashion," carried Doe into the shower as the three laughed.  One of them turned the water on.  Doe, who got "just a little bit wet[,]" thought "it was like a joke."  Doe ran out of the shower.  She declined Knox's offer to dry her clothes.  At this point, Doe had been at the apartment an hour and a half to two hours.

Morrow suggested to Doe that they leave to get something to eat.  She agreed.  Taylor joined them.  Doe let Taylor drive the three of them in her car to Carl's Jr.  Afterwards, they stopped at a CVS and a gas station.  At one point, Doe and Taylor were alone in her car. Taylor started to rub her thigh.  She told him to stop.  He did.  As they drove back to the apartment, Doe received a phone call from Ocampo.  At one point, Taylor took the phone from Doe and told Ocampo, in

4

a "joking" manner, that "we're going to have a four-some." They soon returned to the apartment building and encountered Scooter and his girl friend in the parking lot.

Once inside of the apartment, Doe, Taylor and Morrow watched "The Incredibles" in Taylor's bedroom. During the movie, the two men left the room. At some point, Doe left to find them. She found them in Knox's bedroom, watching pornography with Knox. Doe had not asked the men to play pornographic movies. Doe did not remember whether she said anything when she came upon this scene. Doe and the men laughed and giggled during the movie but did not discuss having sex. Doe stayed in the bedroom for "a couple of minutes" and then went to the living room.

3. *Defendants Sexually Assault Doe on November 10*

As Doe sat on the couch in the living room, Taylor came and sat down. At first, he and Doe playfully wrestled but then he grabbed her wrists and placed his tongue in her mouth. Doe told him to stop and turned her face. Taylor grabbed her by the back of the neck. Doe fought with Taylor and he released his hold.

Feeling uncomfortable because the wrestling had become "serious" and "aggressive," Doe decide to leave. Knox entered the living room and started to wrestle with Doe. Knox held Doe's arms while Taylor slapped her breast several times. Doe struggled and told both men to stop but, because she was laughing, the men did not take her seriously. Morrow stood nearby, also laughing. Eventually, Knox let go of Doe after she screamed "Let go" several times.

Doe went into the bathroom off of Taylor's bedroom. She pulled her pants down and saw that her underwear had been ripped. She yelled: "You guys are stupid. You ripped my underwear." Morrow entered the bathroom. Doe's pants were down but her underwear was on. Doe told Morrow to leave. As Doe

5

attempted to pull her pants up, Morrow started to struggle with her. Morrow called for Taylor. Taylor came into the bathroom. Taylor held Doe's "arms out front against the sink and he dry humped [her]." Doe told him to stop and struggled to free herself from his grip. Taylor and Morrow forced Doe into Taylor's bedroom and pushed her face down onto the mattress.

In the next hour, the following occurred. Morrow sat in front of Doe and held her arms down. Taylor was behind Doe, on his knees. She told them to stop and tried to kick Taylor. Taylor sat on the back of her legs and pulled off her underwear. Taylor "violently" shoved his fingers in her vagina for several minutes. She told him to stop but he ignored her plea. After Taylor ceased his digital penetration of Doe, he retrieved a condom wrapper, opened it, and placed the condom on his penis. Doe appealed to Morrow for help who replied: "Are you sure?" Doe responded "yes." Morrow did nothing to help Doe but, instead, continued to hold her arms down. Doe pleaded: "Stop. Don't do this. Let go of me." Taylor ignored the plea and, while holding his hands around Doe's neck, had forcible vaginal intercourse with her. During the rape, Morrow attempted to kiss Doe when she yelled loudly for Taylor to stop. Doe closed her mouth and turned her head but could not prevent Morrow from placing his tongue in her mouth.

Knox entered the bedroom and Morrow "left." Taylor got up from behind Doe, sat in front of her, and held her hands down. Taylor tried to place his penis in her mouth, telling her "[t]o suck it." Doe closed her mouth and turned her head. At one point, she yelled "stop" whereupon Taylor placed his hands over her mouth. During Taylor's attempted oral copulation, Knox sat on Doe's legs and vaginally raped her. Doe told Knox to stop and tried to get away from him.

After awhile, Taylor and Knox switched positions. Knox sat in front of Doe and attempted to place his penis in her mouth. Doe closed her mouth and turned her head but Knox's penis came in contact with her lips. At the same time, Taylor

6

pulled Doe up onto her knees and again raped her. Doe continued to tell Taylor to stop and tried to move her body away from his penis.

At some point, Taylor stopped raping Doe. Doe noticed that Morrow was "back in the room" and "behind [her]." Morrow attempted to penetrate Doe's vagina with his penis. Doe tried to move away from him. Morrow's penis touched the outside of her vagina but did not enter it. Knox continued to try to place his penis in Doe's mouth. Doe turned and made eye contact with Morrow. "He just looked like he felt bad" and "got up and left" the bedroom.

One of the men (Doe thought probably Knox) placed a pillow over Doe's head. Doe was pushed down into the mattress and raped three times. Doe did not know if the rapes were perpetrated by the same man or different assailants. The pillow was removed from Doe's head after Knox said: "Just let the bitch go."

4. *Doe's Actions Following the Sexual Assaults*

Crying, Doe got up and saw Scooter standing in the room. Doe went into the bathroom. Taylor came in, hugged her, and said: "We'll see you next time." Doe responded that there would not be a next time whereupon Taylor said that "[she] had good pussy." Doe replied: "Fuck you."

Intending to leave, Doe demanded that Morrow return her car keys. After a physical struggle, he complied. Scooter testified that when Doe left the apartment, she told defendants: "You guys don't know when 'no' means 'no.'"[6]

---

[6] Scooter was originally charged with one count of forcible rape while acting in concert. Following a preliminary hearing, that charge was dismissed. At trial, the prosecution called Scooter as a witness. In a sidebar conference, the prosecutor explained that because Knox's pretrial statements denied any sexual relations, Scooter would contradict that claim because he would (and did) testify that he saw Knox having sexual intercourse with Doe (although Scooter testified that it appeared to be consensual). Scooter's testimony on that point turned out to be unnecessary since Knox's subsequent testimony conceded sexual relations with Doe.

7

Doe walked to her car. Against her wishes, Morrow followed her and told her "not [to] blame it on anyone else but [her]self because [she] asked for it" because of her flirtatious conduct.

Doe, crying, drove away. It was approximately 11 p.m. She telephoned Ocampo. Ocampo testified that Doe cried "continuously" throughout the conversation. Doe told her she "had been gang-raped." When Ocampo asked Doe by whom, Doe replied "Scooter and them."

When Doe arrived home, she was still crying. Her mother asked why and Doe falsely told her that "a friend's Mom died." She did not tell her mother about the sexual assaults because "in [her] religion [Islam], it's not like acceptable, and it was going to be hard for [her] to explain why [she] even went there [the men's apartment]." Her mother would not have approved of her going to meet Morrow at the apartment.

Later that evening, Morrow sent Doe an instant message, telling her to "get over it," calling her a "crybaby" and stating "it's [her] fault." Doe felt that if she reported the assaults, no one would believe her "because it was them against [her]." Consequently, she sent Morrow a message "that he was right and that [she does] need to get over it."

However, the next day Doe sent a text message to her friend Eboni White, telling her that she had been raped. She identified her assailants as defendants and Scooter. She gave White "all the big details but not little details." White telephoned Doe and said that they needed to speak about it. The next day, Doe and

White met.  Doe described the assault "in some detail."[7]  Doe showed White her torn clothes and the multiple bruises on her body.

Later that day, Doe told three more people about the crimes:  Doris Santa Cruz, George White and Eric Evans.  Doe told them that she did not want to report the matter to the police because she did not want her mother to learn about it.  Eboni White and Santa Cruz encouraged her to go to the police.  Around this time, Morrow sent Doe a text message telling her that she "need[ed] to stop lying."

On November 13, Doe, accompanied by Eboni White and Santa Cruz, reported the assaults to Deputy Sheriff Chad Limpanukorn.  Thereafter, Toyetta Beukes, a trained forensic nurse, performed a sexual assault exam on Doe.  Doe told Nurse Beukes about the sexual assaults and identified her assailants as defendants and Scooter.  Nurse Beukes took possession of the clothes Doe had worn the night of the assault.  Nurse Beukes testified that Doe had "genital tenderness" and "three bruises."[8]  In addition, Doe's underwear and tank top were torn.[9]  Nurse Beukes testified, that in her expert opinion, Doe's physical condition and clothes were consistent with Doe's description of the sexual assaults.

On November 16, Doe spoke with Detective Greg Salcido.  Detective Salcido testified that Doe told him that she had waited several days to report the assaults.  Doe explained that because of her family and her culture (Lebanese and

---

[7]    The specifics of Doe's statements to White and others will be set forth when we discuss defendants' contention that the trial court abused its discretion in admitting evidence pursuant to the fresh complaint doctrine.

[8]    Photographs of Doe's bruises were introduced into evidence at trial.

[9]    Photographs of Doe's torn underpants and tank top and damaged jeans were introduced into evidence at trial.

Muslim), she feared being shunned and did not want her parents to learn what had happened to her.

In the following days, Morrow confronted Doe in a profane and angry manner, first on the phone and later in person.

On November 14, Deputy Sheriff Limpanukorn arrested Taylor. After advisement and waiver of his *Miranda* rights, Taylor spoke with the deputy. The deputy testified that Taylor admitted that he had had sexual intercourse with Doe but claimed that it was consensual. He explained that Doe had acted flirtatious that evening; that she "was egging it on and she said that she was horny"; and that she told him that "she couldn't turn down Black cock." Taylor further told the deputy "that most of her [Doe's] friends were Black." (Each of the three defendants is Black.)

## B. The Defense Case

1. *Testimony of Taylor*

Taylor testified in front of both juries and denied having raped Doe. He claimed that their sexual relations were consensual. His testimony about how he met Doe and her visits to his apartment, including the November 9th visit, was essentially the same as Doe's testimony. Further, his testimony about the first part of her November 10 visit was quite similar to that of Doe's. He testified about the playful wrestling (although he claimed Doe was sexually aggressive with the men), taking Doe into the shower, and leaving with Doe and Morrow to eat. However, his version of the events sharply diverged from Doe's as to what happened when they returned to the apartment. In that regard, Taylor testified as follows.

After watching "The Incredibles" for approximately 10 minutes in Taylor's bedroom, Doe said that she did not like the movie and "wanted to watch a porno." Soon, Doe, Taylor and Knox were in Knox's bedroom where Knox played a

10

pornographic movie that depicted a Black man and Hispanic woman having sexual intercourse in "a doggy-style position." Doe said she liked "interracial sex" and "the position" depicted in the movie. After the movie was over, Doe went into the bathroom, pulled down her pants, and allowed Taylor to fondle her buttocks and vagina. Later, Taylor heard Doe say on her cell phone: "Eboni White, we're going to have a four-some."

Shortly thereafter, Doe called Taylor into his bedroom. Doe was lying on her stomach on the mattress next to Morrow. Doe's pants were down. Doe told Taylor to do "whatever" he wanted to do. He removed her underpants, digitally penetrated her vagina and had sexual intercourse with her. Doe never resisted Taylor or asked him to stop and Morrow never held her down. After Taylor lost his erection, he asked Doe to orally copulate him. She declined and Taylor did not pursue the matter. Knox, who at some point had entered the bedroom, then had sexual intercourse with Doe who did not resist, scream or fight. Knox left the room and Morrow attempted to have sex with Doe. Doe never said "no" or physically resisted Morrow. After Morrow left the room, Taylor tried again to have sexual intercourse with Doe but failed for lack of an erection. Doe did not verbally or physically resist Taylor's efforts. During all of these events, no one put a pillow over Doe's head. After Taylor's unsuccessful attempt at intercourse, Doe expressed her dissatisfaction with the men's sexual prowess and told Taylor there would not be "a next time."

Taylor's testimony that all three men had sexual relations with Doe was impeached by a prior inconsistent statement he gave to law enforcement. During cross-examination, Taylor conceded that when Deputy Sheriff Limpanukorn first interviewed him, he repeatedly told him that he (Taylor) was the only one who had sexual intercourse with Doe.

11

2. *Testimony of Knox*

Knox testified as follows. During the evening of November 10, he saw Doe and Morrow wrestling on the mattress in Taylor's bedroom. Taylor sat on the bed, watching them. Later, Doe and Morrow wrestled on the living room couch. When Knox approached, Doe grabbed his groin "more than five times." After playfully struggling with Doe for awhile, Knox went to his room. Later, Morrow and Doe approached Knox and asked if he had any pornography. Knox replied that he did. Doe, Morrow, and Knox entered Knox's bedroom. Doe asked Knox to put on an "interracial porno" and stated "I love Black cock." Doe and Morrow, who were now joined by Taylor, watched the movie for 10 to 15 minutes but then left the apartment to go to the store. When they returned, Taylor told Knox that Doe wanted "to have a four-some."

Soon, Knox saw Doe, Taylor and Morrow in Taylor's bedroom. Doe was in "a doggy-style position" and "moaning" as Taylor digitally penetrated her vagina before having sexual intercourse with her. After Morrow left the room, Knox entered and said "It's my turn." Doe responded by "assum[ing]" "the doggy-style position." Knox had sexual intercourse with her but never placed his penis on her lips. Doe did not verbally or physically resist Knox. No one physically restrained her or put a pillow over her head. Later, Knox saw Morrow on his knees "behind" Doe who was in the "doggy-style position." Doe said: "Which one is this?" Doe did not resist Morrow and never yelled or screamed.

Knox's trial testimony that he had *any* sexual relations with Doe was impeached through two prior inconsistent statements. On cross-examination, Knox conceded that "shortly after [the] incident," he telephoned Eboni White and told her that he had not had sexual intercourse with Doe. He also admitted that at an unspecified time, in "Morrow's presence, [he] asserted that [he] didn't have sex with Jane Doe."

12

3. *Testimony of George White*

Lastly, the defense called George White, Eboni White's brother, in an effort to cast doubt on Doe's testimony that she had been raped. George White testified to a 30-minute conversation he had with Doe "a few days after the incident." Doe told him that "she had been raped" but further explained that at first "she was not sure if she was raped," so she "looked online on the internet" for the definition of rape and had then concluded she had been raped. White testified in a conclusory manner about what Doe told him about the events.

However, on cross-examination, the prosecutor elicited from White a much more detailed testimony about Doe's "fresh complaint" to him that, in fact, supported the prosecution's theory of forcible sexual assaults.[10]

White asked Doe why she had not reported the incident to the police. Doe explained that she was afraid because her parents would learn about it.

## C. New Trial Motions

After the jury returned with its verdicts, defendants moved for a new trial. They raised two grounds: inconsistent verdicts because Taylor was acquitted of all charges and insufficient evidence because Doe's testimony was contradicted by

---

[10] For instance, White testified that Doe told him that after she went into the bathroom to check her underwear, Morrow entered the bathroom. She tried to pull her pants up but Morrow held her arms. Taylor entered the bathroom. The two defendants held her and "started feeling on her, touching her." In an emotional tone, Doe told White that Taylor and Morrow then took her into the bedroom where they bent her over the bed and Taylor had "sex with her." Doe told them to stop and tried to push them off of her. At one point, someone pushed a pillow over her face. Her face was crammed into the mattress and she could not see who "was having sex with her." Doe told White that she was not sure if she had had sex with either Knox or Scooter because the pillow was over her head. She said nothing about Morrow having sex with her but did indicate that she was upset because he had not tried to help her.

13

other witnesses. The trial court denied the motions. It explained: "The court has done an independent evaluation of the testimony that was proffered in this particular case as is required by statute. The court found the victim's testimony to be in most [pertinent] areas credible. . . . [¶] . . . The court has acted as the [13th] juror to use those words, and the court at this time is denying the . . . motion for new trial." In addition, the judge stated: "The court will not be disturbing the jury's verdict as to these two defendants despite the fact that the third defendant was acquitted. . . . [¶] More specifically, inconsistent verdicts are occasionally inevitable, in no way satisfying, but sometimes a consequence of the criminal justice system where there are multiple juries."

## DISCUSSION
### A. THE TRIAL COURT'S EVIDENTIARY RULINGS

Defendants first contend that the trial court's evidentiary rulings made both before and during trial deprived them of their constitutional rights to confront and cross-examine and to due process. In particular, defendants urge that the trial court erroneously precluded them from: (1) presenting evidence to show that Doe preferred to date and have sexual relations with Black men; (2) cross-examining Doe on that issue; and (3) establishing that Doe had a motive to falsely accuse them of the sexual assaults. The trial court's rulings were based upon Evidence Code section 1103, subdivision (c)(1) that prohibits evidence of the victim's sexual conduct with men other than the defendant to prove consent and section 782 that sets forth a specific procedure that must be followed if the defense seeks to

14

impeach the victim of a sexual assault with evidence that involves sexual conduct.[11]

1. *The Trial Court's Pretrial Rulings Were Not an Abuse of Discretion*

a. *Factual Background*

At a pretrial hearing, the trial court ruled that evidence about Doe's dating relationship, including sexual conduct, with any of the three defendants was admissible. However, the court rejected three separate defense requests to introduce evidence that Doe preferred to date and have sexual relations with Black men. The particulars of those rulings are the following.

The defense requested permission to question Doe if she had a general preference for Black men, claiming that an affirmative answer would support their defense of consent. The trial court denied the request, citing section 1103, subdivision (c).

In a similar vein, the defense wanted to introduce at trial what they claimed to be a printout of a communication from Doe's MySpace page written a month *before* the crimes occurred.[12] The statement reads: "I know mann. I juss dnt wanna keep adding guys to my list I juss wanna be sure that their gonna lay it on me before I freakin fucc them but talk is cheap as fuccccc. . . . Wat are we doin today? *I wanna go to that one street in Dena when I say Blacc guys I mean so*

---

[11]     All undesignated statutory references in Section A of Discussion are to the Evidence Code.

[12]     The prosecutor argued, among other points, that no foundation had been laid for the statement because the defense had offered no evidence to establish that the statement came, in fact, from Doe's MySpace account.

15

*mannyyyy Blacc guys.* IMAO."[13] (Italics added.) The defense argued that because the statement suggested Doe's desire to meet Black men, it bolstered their theory that she had consensual sexual relations with defendants on the night in question. The trial court ruled that the MySpace statement was barred by section 1103, subdivision (c).

Lastly, the defense indicated that it intended to introduce evidence that Doe had stated, on various occasions, that "she liked Black cock." The defense urged that this evidence "goes to the consent issue." At the suggestion of the prosecutor, the court ruled that defendants, but no one else, could testify to those statements if Doe made them in their presence on the night in question.

b. *Discussion*

In 1974, the Legislature enacted the statutory provision now found in section 1103, subdivision (c)(1). (*People v. Blackburn* (1976) 56 Cal.App.3d 685, 689-690.) The relevant portion of the statute provides that in sexual assault cases, "evidence of specific instances of the complaining witness' sexual conduct . . . is not admissible by the defendant in order to prove consent by the complaining witness." This provision does not apply "to evidence of the complaining witness' sexual conduct with the defendant." (§ 1103, subd. (c)(3).)

The Legislature enacted the statute because it "recognized that evidence of the alleged victim's consensual sexual activities with others has little relevance to whether consent was given in a particular instance." (*People v. Chandler* (1997) 56 Cal.App.4th 703, 707.) "This rule properly prevents the victim of [a] sexual assault from being herself placed on trial" and "avoid[s] the harassment which had

---

[13] The parties debated, but the trial court did not decide, the meaning of "IMAO". There is no need for us to resolve that point.

16

traditionally plagued complaining witnesses in cases of this type" (*People v. Rioz* (1984) 161 Cal.App.3d 905, 916), a harassment that "deterred victims from filing complaints and resulted in a low percentage of reported rapes." (*People v. Casas* (1986) 181 Cal.App.3d 889, 895.) The statute does not deny a defendant his due process right to a fair trial or the right to confront and cross-examine witnesses. (*People v. Blackburn, supra,* 56 Cal.App.3d at pp. 690-691.)

We review the trial court's ruling determining the admissibility of evidence pursuant to section 1103, subdivision (c)(1) for an abuse of discretion. (*People v. Woodward* (2004) 116 Cal.App.4th 821, 832.) We will not disturb its exercise of discretion unless defendants establish that it was exercised "in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

In exercising its discretion whether evidence should be excluded pursuant to section 1103, subdivision (c)(1), the trial court must determine whether the proffered evidence relates to the victim's sexual conduct. As used in this section, sexual conduct "encompasses any behavior that reflects the actor's or speaker's willingness to engage in sexual activity. The term should not be narrowly construed." (*People v. Franklin* (1994) 25 Cal.App.4th 328, 334; see also *People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1456 [the term "sexual conduct" should be interpreted broadly].) Consequently, evidence that the victim offered to a third man (not the defendant) to have sexual intercourse for money was prohibited by section 1103, subdivision (c)(1) because the evidence reflected the victim's "willingness to engage in sexual intercourse." (*People v. Casas, supra,* 181 Cal.App.3d at p. 895; see also section 125 ["'Conduct' includes all active and passive behavior, both verbal and nonverbal."].)

Defendants contend that Doe's preference for Black men does not constitute evidence of sexual conduct. They argue that a "person's tastes are not 'sexual

17

conduct.' Nor are a person's motives or expression of likes on social network sites." Instead, according to defendants, they are merely "statements of a declarant's mental state." In this case, that is a distinction without a difference. While the defense evidence did set forth Doe's mental state (her preference for Black men, her intent to go to an area where Black men congregated, and her enjoyment of "Black cock"), the evidence was inextricably related to Doe's sexual conduct: each item indicated, either directly or indirectly, her willingness to engage in sexual relations with Black men. Defense counsel conceded as much when they explained that the evidence was relevant to their theory that it created the inference that Doe consented to sexual relations with defendants because she has a sexual preference for Black men. The trial court therefore did not abuse its discretion in precluding defendants from presenting this evidence.

Defendants rely upon *People v. Geier* (2007) 41 Cal.4th 555 (*Geier*) to argue for a contrary conclusion. *Geier* is clearly distinguishable. In *Geier*, the defendant was convicted of murdering Erin Tynan during commission of a forcible rape. The defendant, who was White, claimed that Tynan had consented to sexual intercourse. (*Id*. at pp. 587 & 586.) To help prove that the deceased victim had not consented, the trial court permitted the prosecution, over defense objection, to present William Jones, Jr.'s testimony that Tynan had told him that "she preferred muscular African-American men as sexual partners." (*Id*. at p. 585.) The trial court found that the evidence was relevant to Tynan's state of mind in that it reflected on whether she would have consented to sexual relations with the defendant, a White man, and was therefore relevant. (*Id*. at p. 586.)

On appeal, the Supreme Court held that the trial court's ruling did not constitute an abuse of discretion. (*Geier, supra*, 41 Cal.4th at p. 587.) It reasoned: "Jones's testimony that Tynan had indicated to him she like muscular African-American men bore some relevance to whether she would have consented to

18

sexual relations with defendant." (*Ibid*.) "[G]iven her preferences, [the testimony tended to prove that] Tynan would not have consented to sexual relations with defendant, who is White" (*id*. at p. 586) and therefore tended to prove that the defendant forcibly raped her.

Defendants argue that if in *Geier* evidence about the victim's preference for Black men was admissible to show lack of consent with a white man, then evidence of Doe's preference for Black men should likewise have been admissible in this case to establish consent. We are not persuaded.

For one, *Geier* never considered or discussed section 1103, subdivision (c)(1), the basis upon which the trial court excluded the evidence in this case. The reason is clear: section 1103, subdivision (c)(1) prohibits only the defense from offering the evidence to prove consent. The statute says nothing about the prosecution's ability to introduce such evidence to prove lack of consent. Thus, *Geier* does not support defendant's argument. "It is axiomatic that cases are not authority for propositions not considered." (*People v. Gilbert* (1969) 1 Cal.3d 475, 482, fn. 7.)

Anticipating this analysis, defendants next cite *Wardius v. Oregon* (1973) 412 U.S. 470 (*Wardius*) to argue that "because the prosecution is allowed to present this type of evidence . . . in cases like *Geier* – [defendants] should have been allowed to do so in this case." Defendants' reliance upon *Wardius* is misplaced. *Wardius* established a discrete principle: discovery obligations should be reciprocal. It found that a state law that required the defendant to give notice to the prosecution of its alibi witnesses but did not impose any requirement on the prosecution to inform the defense of the witnesses it intended to call to refute the alibi defense violated due process. (*Id*. at pp. 471-473, 476.) Nothing in *Wardius* suggests that its rule of reciprocity should be extended beyond the context of discovery obligations and defendants cite no cases to support that view. (See

19

*Whitman v. Superior Court* (1991) 54 Cal.3d 1063, 1082 [Penal Code section 872, subdivision (b) permitting the People to use hearsay evidence to establish probable cause at a preliminary hearing without giving the defense a reciprocal right does not violate *Wardius'* requirement of reciprocity] and *People v. Brodit* (1998) 61 Cal.App.4th 1312, 1325-1327 [even if new hearsay exceptions found in sections 1253 and 1360 "create a one-way flow of evidence in favor of the prosecution," there is no violation of *Wardius* or due process].)

Further, section 1103, subdivision (c)(1)'s lack of reciprocity—it limits the defense but not the prosecution—is rational. As explained above, the Legislature decided to prohibit the defense from introducing evidence about the victim's sexual conduct to prove consent in order to avoid harassment and embarrassment of the victim and to encourage the victim to report a sexual assault. Permitting the prosecution to introduce evidence about the victim's sexual conduct to prove lack of consent—as happened in *Geier*—does nothing to undermine those goals but, instead, furthers the Legislature's goal of prosecuting those responsible for violent sexual assaults.

In any event, assuming arguendo the trial court's ruling was an abuse of discretion (a finding we do not make), any error was harmless because other evidence was offered to show Doe's interest in Black men. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) As set forth earlier, Deputy Sheriff Limpanukorn testified that when he first interviewed Taylor, Taylor told him that Doe had said that "she couldn't turn down Black cock." Knox testified that when Doe requested "an interracial porno," she stated "I love Black cock." And Taylor testified that while he, Knox and Doe watched the movie, Doe commented that "she likes

interracial sex."**14** Consequently, evidence was presented about Doe's purported sexual preference for Black men.

In an effort to avoid this conclusion, defendants claim that this evidence would have carried more weight with the jury had they been able to elicit it from Doe on cross-examination. The argument is not persuasive for several reasons. As defendants concede, the order of proof and presentation of evidence lie within the trial court's discretion. (*People v. Tafoya* (2007) 42 Cal.4th 147, 175, and statutes cited therein; see, in general, 3 Witkin, Cal. Evidence (5th ed. 2012) Presentation at Trial, § 58, pp. 107-108.) Given the mandate of section 1103, subdivision (c)(1) and the marginal relevance of the proffered evidence, defendants have failed to establish that the trial court's decision to permit defendants to testify to these statements but to preclude defendants from cross-examining Doe about them was an abuse of discretion. Further, their claim that evidence would have been more persuasive had they been allowed to elicit it during the Prosecution's case is unsupported speculation.**15** In fact, this claim rings particularly hollow given that

---

**14**     Defendants' suggestion that Taylor was improperly precluded from testifying about Doe's interest in Black men is not supported by the record. Defendants rely upon a brief portion of Taylor's direct testimony. After defense counsel examined Taylor about the night before the crimes when he and Morrow were with Doe, counsel asked: "Did Ms. Doe express a verbal interest to you about her interest in Black men?" The prosecutor objected: "Hearsay, relevance and leading." The trial court sustained the objection on the ground that it was leading. Thereafter, defense counsel did not rephrase the question in a non-leading manner. It is therefore apparent that the trial court did not preclude defense counsel from inquiring, in a legally proper manner, about any statement made by Doe directly to Taylor about her purported interest in Black men.

**15**     Defendants' assertion that in closing argument "the prosecutor claimed the defense was fabricating the evidence since it came exclusively from their self serving testimony" is not supported by the record. The prosecutor never asserted that their testimony about Doe's sexual comments were fabricated. In fact, she told the jury to assume that the testimony was true but then argued that the testimony was an attempt "to slutify her [Doe] to get focused on the fact that she's a slut and she doesn't deserve the protection of

21

neither of their closing arguments made any mention of the evidence that *was presented on this issue*. That is, they never argued (as they did during the pretrial hearings) that this evidence suggested that Doe, having a sexual preference for Black men, had consented to sexual relations with them. Instead, they argued only that the testimony of Taylor and Knox established consent and that Doe's contrary testimony was not credible. In sum, defendants have failed to establish prejudicial error under the *Watson* standard.[16]

---

the law. . . . She watched porn. She made salacious comments. She's a slut anyway. We don't need consent, and who cares. She's just a slut. . . . That's their defense."

At that point, defense counsel again moved for a mistrial because it had not been "allowed to confront Jane Doe with any of the statements that were made during the course and scope of the playing of the pornography; I like Black cock, et al. [¶] We were prohibited from bringing it up during the course and scope of our cross-examination of Jane Doe, and we have now seen in real time what that has done to the defense from the standpoint of the People's argument. [¶] . . . Their argument is that these defendants made it up."

The trial court denied the motion for a mistrial. It noted that it had previously ruled that the defense "would be afforded the opportunity to put forward the alleged statements of [Doe] should the defendants testify," and that Knox and Taylor had, in fact, testified that Doe had made those statements to them. The court then went on to observe that the prosecutor had argued only "that assume that Jane Doe made those statements . . . and then . . . followed up with the argument that that does not equal consent. [¶] Given the totality of the argument and the court's previous ruling, the request for a mistrial is denied."

[16] Defendants assert that any error that may have occurred in regard to the trial court's evidentiary rulings should be evaluated under the harmless beyond a reasonable doubt standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 because they were denied their constitutional rights to confront and cross-examine and to present a defense. We disagree. The California Supreme Court has held consistently that a trial court's application of the rules of evidence does not result in a deprivation of those constitutional rights when, as here, the defense is not precluded from challenging the prosecution's case or presenting a defense. (See, e.g., *People v. Fontana* (2010) 49 Cal.4th 351, 370; *People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103; and *People v. Espinoza* (1992) 3 Cal.4th 806, 818.)

In this case, evidence was admitted about Doe's purported interest in sexual relations with Black men. Nothing prevented defense counsel from arguing that said evidence constituted circumstantial evidence of consent; defense counsel chose not to

c. *The Trial Court Did Not Abuse its Discretion in Limiting Defense Cross-Examination of Ocampo*

As noted earlier, Doe, testified that on November 9 (the day before the sexual assaults) she and Ocampo went to the apartment shared by Knox and Taylor where everyone socialized. Ocampo, called as a prosecution witness, also testified to those facts.

Defense counsel sought to cross-examine Ocampo about a conversation she had with Doe that night (Nov. 9) in which Doe allegedly expressed her interest in Black men and her enjoyment of kissing.[17] The trial court sustained the prosecutor's objection, citing section 1103, subdivision (c)(1). Defense counsel

---

pursue that argument before the jury. Further, the defense was given wide latitude to challenge the prosecution's case. Each defense counsel vigorously cross-examined Doe and two defendants (Knox and Taylor) testified that Doe had consented. Defense counsel's closing arguments attacked Doe's credibility at length and relied upon the defense evidence that the encounter had been consensual to argue the People had failed to establish guilt beyond a reasonable doubt. In sum, "[i]f the trial court misstepped, '[t]he trial court's ruling was an error of law merely; there was no refusal to allow [defendants] to present a defense, but only a rejection of some evidence concerning the defense.' [Citation.] Accordingly, the proper standard of review is that announced in *People v. Watson* (1956) 46 Cal.2d 818, 836, and not the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension [citation]." (*People v. Fudge, supra,* 7 Cal.4th at p. 1103.)

[17] During cross-examination, defense counsel sought to ask Ocampo about "sexual banter" she had with Doe in which both Ocampo and Doe expressed their interest in Black men. In a sidebar conference, defense counsel opined that defendants were present during this conversation. According to defense counsel's proffer, "at one point Miss Doe said something to the effect, 'I don't have sex,' and then Miss Ocampo said to Miss Doe, 'You're lying like a ho.' And that Miss Doe replied she just loves kissing and they all laughed about it." Defense counsel argued because defendants were present during this "sexual banter," testimony about the conversation "directly relates to implied or direct consent at later date between . . . Doe and the [defendants]." The trial court, citing section 1103, subdivision (c)(1), excluded the evidence.

23

moved for a mistrial, claiming that their clients' rights to due process and to confront and cross-examine were being denied. The trial court denied the motion.

For the reasons explained in our earlier analysis of the trial court's pretrial rulings, we find that defendants' proposed cross-examination of Ocampo violated section 1103, subdivision (c)(1) because it improperly sought to elicit from her evidence of Doe's general sexual conduct: her preference for Black men and enjoyment of kissing. Therefore, the trial court's ruling prohibiting this cross-examination was not an abuse of discretion.

2. *Defendants Have Forfeited Their Claim that the Trial Court Improperly Precluded Them From Impeaching Doe Regarding A Motive to Falsely Accuse Them*

One of the disputed issues at trial was why Doe had delayed in reporting the sexual assaults. The prosecution's theory, supported by Doe's testimony, was that as a result of her ethnic background (Lebanese), religion (Islam), and close family, she feared her family's disapproval for having been with defendants on the night in question.

The defense suggested the following theory. Doe previously had an intimate relationship with Emmanuel Moultrie (aka Mozart), one of Taylor's friends. At or around the time of the crimes, Doe hoped to resume her relationship with Moultrie. Doe fabricated the claim of rape "to save face" with Moultrie after she learned that Morrow had told Moultrie that she had engaged in consensual sexual relations with defendants.

This issue arose first during opening statements. Taylor's attorney told both juries that Doe wanted to become part of Taylor's circle of friends "and that she also had been involved with one of his friends named Emmanuel Moultrie also" at which point the prosecutor objected. A lengthy sidebar conference followed.

24

Defense counsel never responded to multiple requests from the trial court for an offer of proof about Moultrie's trial testimony.[18] The parties debated whether the brief statement insinuated that Doe previously had a sexual relationship with Moultrie because, if it did, the parties agreed that the statement violated the court's pretrial order that evidence could not be produced about Doe's sexual relations with men other than defendants. Defense counsel concluded: "And rather than go into an area that may involve a violation, I'm just going to move on." The court responded: "Okay. I do not believe that you violated the order." (Defendants raise no claim of error in regard to this colloquy.)

The matter arose again during the defense cross-examination of Eboni White. While exploring why Doe delayed in reporting the sexual assaults, defense counsel asked White: "And she [Doe] also indicated to you that she was not going to report this until after she had heard that [Moultrie] had heard about it?" The prosecutor objected "Double hearsay. And relevance." The court sustained the objection and granted the prosecutor's motion to strike. Outside of the jury's presence, the parties argued a length about this line of questioning. Ultimately, the trial court precluded it, finding that "if [the defense] position is [that] Doe wanted to resume a boyfriend/girlfriend relationship with [Moultrie], that that does come under [section] 1103(c). But before we get there, it's still multiple layers of hearsay."

a. *Discussion*

Defendants now contend that the trial court improperly found the evidence to be hearsay because the "statement [was] not offered for the truth of the matter asserted – that Moultrie really had heard of the statement – but rather to show the

---

[18] Moultrie, in fact, did not testify at trial.

25

effect on Doe's state of mind and explain her subsequent actions. Thus, even if Moultrie never heard of the events and the report was incorrect, it is relevant because of Doe's reaction to the statement." That is, defendants argue that the evidence was offered for the non-hearsay purpose of impeachment. They claim that the evidence was offered to impeach Doe's testimony by establishing a motive for her to fabricate a claim of rape: her desire to counter the statement made to Moultrie that she had consensual sex with defendants. (§ 780, subd. (f).) However, as explained by defense counsel, her motive to fabricate was inextricably intertwined with evidence that she previously had a sexual relationship with Moultrie that she wished to resume. Thus, this evidence called into play section 782 which sets forth strict procedures for impeachment when the evidence involves the victim's prior sexual conduct.

"Because the victim's credibility is almost always at issue in sexual assault cases, Evidence Code section 782 specifies a procedure" for the trial court to review the proffered evidence in order to avoid "an undermining of the legislative intent to limit public exposure of the victim's prior sexual history." (*People v. Chandler, supra,* 56 Cal.App.4th at p. 707, fn. omitted, & 708.) The statute provides that a "written motion must be made which includes an offer of proof of the relevancy of the evidence of sexual conduct [here, Doe's prior sexual relationship with Moultrie] and its relevancy in attacking the credibility of the complaining witness." (*People v. Daggett* (1990) 225 Cal.App.3d 751, 757.) The motion must be "accompanied by an affidavit, filed under seal, that contains the offer of proof." (*People v. Fontana, supra,* 49 Cal.4th at p. 362.) "If the court finds the offer of proof sufficient it shall order a hearing out of the presence of the jury at which the complaining witness may be questioned." (*People v. Daggett, supra,* 225 Cal.App.3d at p. 757.) If "the court, following the hearing, finds that the evidence is relevant under Evidence Code section 780 [which sets forth proper

methods of impeachment] and is not inadmissible under section 352, then it may make an order stating what evidence may be introduced by the defendant and the nature of the questions to be permitted. [Citation.]" (*People v. Fontana, supra,* 49 Cal.4th at p. 362.)

In this case, defendants did not comply with that procedure. They did not file a written motion to impeach Doe in this manner nor did they proffer a sealed affidavit containing an offer of proof. Consequently, they have forfeited any claim that the trial court erred in precluding them from impeaching Doe on this basis.[19] (*People v. Sims* (1976) 64 Cal.App.3d 544, 554.)

---

[19] During the prosecutor's cross-examination of Taylor, she asked him: "And her [Doe] having no bad blood with you, no need for revenge, just manufactured [the claim of forcible oral copulation] out of thin air?" Defense counsel objected. Outside of the jury's presence, defense counsel explained that he objected because the court had "clearly" ruled that no one was "to go into any theories about why Ms. Doe may or may not be getting back at [defendants] because of her relationship" with Moultrie. The court sustained the objection. When proceedings resumed in front of the jury, the prosecutor continued her cross-examination of Taylor without further reference to this topic.

Defendants now complain that the court did not admonish the jury to disregard the prosecutor's question. They argue that without such an admonition, "the smell of the skunk remained" because "the jury heard the question and never heard the result." The argument fails for two separate reasons. First, CALCRIM No. 222 informed the jury that the attorneys' "questions are not evidence. Only the witnesses' answers are evidence. . . . *Do not assume that something is true just because one of the attorneys asked a question that suggested it was true.* [¶] During the trial, the attorneys may have objected to questions. . . . I ruled on the objections according to the law. *If I sustained an objection, you must ignore the question. If the witness was not permitted to answer, do not guess what the answer might have been or why I ruled as I did.*" (Italics added.) The jury is presumed to have followed this instruction. (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.) Second, defendants' failure to request an admonishment constitutes a forfeiture of their claim. (See *People v. Samayoa* (1997) 15 Cal.4th 795, 843.)

27

3. *The Trial Court Did Not Abuse Its Discretion In Precluding the Defense From Cross-Examining Doe about Statements Attributed to Her By Scooter*

a. *Factual Background*

Before Scooter, Taylor and Knox's cousin, testified as a prosecution witness (see fn. 6, *ante*), a lengthy hearing was held outside of the jury's presence to determine the proper scope of defense cross-examination. Defense counsel intended to ask him about two statements that he allegedly heard Doe make while watching the pornographic movie with defendants: "I like having interracial sex" and "Good position. I would like to try having it that way." The defense argued the evidence was relevant to establish consent (express or implied). The court ruled that section 1103, subdivision (c)(1) barred admission of the statements.

Doe testified after Scooter. After the prosecutor completed her direct examination, defense counsel asked the court if they could cross-examine Doe about the statements Scooter had allegedly heard her make while watching the pornographic movie. Defendants advanced two arguments. First, they reiterated their earlier claim that Doe's statements were not barred by section 1103, subdivision (c)(1). Second, they argued the question was proper impeachment. They relied upon the fact that during direct examination, Doe had testified that she did not remember whether she had said anything when she saw defendants watching the pornographic movie in Knox's bedroom. Defendants claimed that the statements attributed to Doe by Scooter constituted prior inconsistent statements. (§ 1235.)

The trial court rejected both arguments. First, it found that the statements were evidence of Doe's sexual conduct and therefore barred by section 1103, subdivision (c)(1). Second, it found that to the extent that defendants were attempting to attack Doe's credibility through these statements, they had failed to comply with section 782. As explained earlier, section 782 requires, among other

things, a written motion accompanied by a sealed affidavit containing an offer of proof when, as here, the impeachment involves evidence of the victim's sexual conduct. (§ 782, subd. (a) & (b).) The court did note, however, that defendants could testify to Doe's statements made in their presence while watching the movie. The trial court denied defendants' subsequent motion for a mistrial based upon the claim that these rulings denied them the right to confront and cross-examine.

b. *Discussion*

The trial court's rulings were not an abuse of discretion. Scooter's testimony about Doe's statements of her sexual preferences constituted evidence about her sexual conduct and thus was not admissible to prove consent. (§ 1103, subd. (c)(1).) To the extent that defendants intended to impeach Doe by asking her about these statements, we are not convinced that this constituted proper impeachment through prior inconsistent statements since "the general rule is testimony of a witness to the effect [s]he does not remember an event is not 'inconsistent' with a prior statement by [her] describing that event." (*People v. Simmons* (1981) 123 Cal.App.3d 677, 681.) But we need not resolve that point as it is clear that the purported impeachment triggered section 782 because it involved evidence of Doe's sexual conduct, and, as the trial court correctly noted, defendants failed to comply with the prophylactic procedure set forth in section 782. This failure constitutes a forfeiture of their claim that they were denied the right to impeach with this evidence. (*People v. Sims, supra,* 64 Cal.App.3d at p. 554.)

29

## B. THE TRIAL COURT'S ADMISSION OF EVIDENCE PURSUANT TO THE FRESH COMPLAINT DOCTRINE

Defendants next contend that the trial court committed prejudicial error because it permitted multiple witnesses to testify pursuant to the fresh complaint doctrine. We disagree.

To properly analyze this contention, we begin with the law regarding the fresh complaint doctrine. Then, we set forth the trial court's pretrial ruling about the testimony. After that, we detail the testimony of each witness and discuss its propriety. Lastly, we address defendants' argument that, taken together, the evidence was inadmissible, cumulative and hence prejudicial.

1. *Legal Background – The Fresh Complaint Doctrine*

"Under the fresh complaint doctrine, 'proof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose—namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others— whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred.' [Citation.] The jury may consider the evidence 'for the purpose of corroborating the victim's testimony, but not to prove the occurrence of the crime. [Citation.]'" (*People v. Manning* (2008) 165 Cal.App.4th 870, 880.) The victim's identifications of the assailant(s) and the nature of the crime(s) are properly included within evidence of the fresh complaint. (*People v. Burton* (1961) 55 Cal.2d 328, 351.) The admissibility of this evidence does not turn "upon whether the victim's complaint was made immediately following the alleged assault or was preceded by some delay, nor upon whether the complaint was volunteered spontaneously by the victim or instead was prompted by some inquiry

30

or questioning from another person." (*People v. Brown* (1994) 8 Cal.4th 746, 763.) Instead, the jury may consider those factors in assessing the significance of the victim's complaint. (*Ibid.*) However, "it is well settled that only the *complaint* may be proved; the details of the alleged offense are incompetent hearsay, and the witness should not be allowed to recite those details in testifying to the complaint [unless an exception to the hearsay rule is present]." (1 Witkin, Cal. Evidence (5th ed. 2012) Hearsay, § 170, p. 1020.)

*If requested*, the trial court must instruct the jury about "the limited purpose for which the fresh complaint evidence was admitted. [Citation.] However, the trial court has no duty to give such an instruction in the absence of a request. [Citation.]" (*People v. Manning, supra,* 165 Cal.App.4th at p. 880.) In this case, defendants did not request such an instruction. However, as will be seen, during the testimony of one witness, the trial court did instruct the jury about the limited use to which it could put the evidence.

2. *The Trial Court's Pretrial Ruling*

Defendants sexually assaulted Doe on November 10. Doe reported the matter to the police on November 13. Prior to trial, the People filed a motion to admit testimony from three witnesses (Ocampo, Eboni White, and Deputy Sheriff Limpanukorn) pursuant to the fresh complaint doctrine.

At the hearing conducted on the motion, the prosecutor indicated that she was also considering calling George White and Doris Santa Cruz to testify to Doe's statements that qualified as fresh complaints but that she was concerned that their testimony would "be relatively cumulative." Defense counsel stated: "I'd . . . request that the People, even though they do not call – maybe at some point do not intend to call the witnesses, that they make them available to the defense and keep them on-call so we can call them." Over the defense's objection, the trial court

31

ruled that Ocampo and Eboni White could, based upon the fresh complaint doctrine, testify to the statements that Doe made to them in the days following the rape. The court also ruled that Deputy Sheriff Limpanukorn could testify about the "descriptions" and "details" relayed to him by Doe on November 13. The court made no specific ruling about Santa Cruz or George White, stating, it "doesn't look like you're calling" either of them.[20]

3. *The Witnesses' Testimony*

a. *Ocampo*

Ocampo testified that Doe telephoned her on November 10, "around 10:40 or 10:45" p.m. Doe cried "continuously" throughout the conversation. Doe told Ocampo that she "had been gang-raped." Doe said: "They raped me." When Ocampo asked who, Doe replied "Scooter and them." The trial court ruled that this testimony was admissible for the truth of the matter asserted as a spontaneous statement (Evid. Code, § 1240), a ruling defendants do not contest in this appeal.

In addition, Ocampo testified that "either the next day or two days after," she saw Doe. Doe told Ocampo that on the night she had telephoned her, "they had raped her and . . . used a pillow over her face." Doe identified her assailants as the three defendants and Scooter. This testimony was properly admitted as a fresh complaint because it identified the crime and its perpetrators. (*People v. Burton, supra*, 55 Cal.2d at p. 351.)

---

[20] As set forth previously in our statement of facts, the defense called George White as a witness.

b. *Eboni White*

Eboni White testified to a series of text messages exchanged by her and Doe during either the evening of November 10 or the next day. Doe sent a text reading: "I got raped." White asked by whom. Doe replied: "Damien [Morrow], Tray [Taylor], Phillip [Knox], and Scooter." The next day, Doe and White spoke face-to-face. Doe again identified her assailants as the three defendants and Scooter and said that the assaults occurred at Taylor's home. White testified that Doe described the assaults to her as follows. Morrow dragged her into the bedroom where he and Taylor pushed her on to the bed. Morrow pulled her pants down. While Morrow held her down, Taylor first inserted her fingers into her vagina and then raped her. Doe screamed and said "no." Later, Taylor tried to force Doe to orally copulate him. At some point, one of the men placed a pillow over her head and Doe believed Knox and Taylor "switched off" raping her. Scooter sat in the room during these events.[21]

White's testimony about the text messages and the conversation in which Doe again identified defendants as her assailants is covered by the fresh complaint doctrine because Doe's statements simply identified the crimes and its perpetrators. The testimony was therefore properly admitted. (*People v. Burton, supra,* 55 Cal.2d at p. 351.)

The bone of contention is White's testimony about Doe's statements explaining what each defendant did. Defendants contend this exceeded the boundaries of the fresh complaint doctrine because of the details Doe supplied.

---

[21] Eboni White also testified that later that day, she was with Doe when Doe told Eric Evans and George White about the assaults. Eboni White did not testify about any details of that conversation and the prosecutor did not call either man as a witness. Further, Eboni White testified that she was present when Doe told Doris Santa Cruz (Santa Cruz) about the attacks. According to Eboni White, Doe told Cruz "the same things" that she had previously told her.

The Attorney General counters that this evidence was properly admitted because it "did no more than briefly explain who did what to Doe during the gang rape" and that it does "not exceed what has been acceptable in other cases." The Attorney General relies upon two cases: *People v. Butler* (1967) 249 Cal.App.2d 799, 804 [witness testified that the child victim told her: "'[T]he man was sucking his thing.'"] and *People v. Cordray* (1963) 221 Cal.App.2d 589, 594 [witness testified that the child victim told her that the defendant "had pulled her pants down and he had kissed her between the legs."].) We need not decide this point because assuming arguendo that the evidence was erroneously admitted (a finding we do not make), its admission was not prejudicial.

Error in admitting fresh complaint evidence is evaluated under the harmless error standard set forth in *People v. Watson, supra,* 46 Cal.2d at page 836. (*People v. Manning, supra,* 165 Cal.App.4th at p. 880.) In this case, it is not reasonably probable a different result would have occurred (acquittal of all of the charges) had White's testimony not been admitted. For one thing, Doe testified to the same facts, albeit in much more detail, and was subject to vigorous cross-examination by defense counsel. Consequently, the jury "did not have to rely on [Doe's] secondhand statements to other people [including White], but was able to hear her directly and judge her credibility." (*Id.* at p. 881.) As a result, Doe's credibility—not White's—was the focus of each party's closing argument. Further, the prosecutor never relied upon the arguably inadmissible hearsay portion of White's testimony to argue that defendants' guilt had been proven beyond a reasonable doubt but, instead, relied primarily upon Doe's extremely detailed testimony about the sexual assaults to argue that the People had met their burden of proof.[22] And,

---

[22] The prosecutor's closing argument made only brief reference to the portion of the fresh complaint in which Doe told White that she had been raped by defendants.

as explained below in discussing Deputy Sheriff Limpanukorn's "fresh complaint" testimony, this is not a closely divided case where erroneously admitted evidence would have improperly tipped the balance in favor of the People.

c. *Santa Cruz*

Santa Cruz testified about the conversation she had with Doe in White's presence on November 11. Doe told her "I got raped." Doe explained that the assault occurred after she went to see Morrow. She told Santa Cruz that Taylor and Scooter were also present at the apartment. Santa Cruz testified that Doe's disclosure was "just very general" and provided "[n]o details." Doe told Santa Cruz that Taylor was the first to rape her. During the rape, Doe cried and told Taylor to stop. Santa Cruz further testified that Doe told her that "while her and Tray [*sic*] were having sex," Morrow entered the room and asked her: "'Do you want me too' or something to that effect. And that she was like, 'no.' And that he was like 'okay,' and just walked back out of the room." Again, this testimony fell well within the parameters of the fresh complaint doctrine because essentially it did no more than identify the crime (rape) and the assailant (Taylor). (*People v. Burton, supra,* 55 Cal.2d at p. 351.) To the extent the statements referenced Morrow, they exculpated him. Essentially, Doe stated that Morrow asked her permission to have sexual relations with her; she replied that she did not; and he honored that request by leaving the room.

In addition, Santa Cruz testified that the next day she accompanied Doe to the sheriff's station where Doe spoke with Deputy Sheriff Chad Limpanukorn. According to Santa Cruz, Doe told the deputy that she went to visit Morrow. At some point, she wrestled with the three defendants and her clothes were torn. She went into the bathroom to "fix" herself. When she rejoined defendants, they were watching pornography. She watched "for like a minute or two" and then "they

35

started wrestling again." "[Taylor] started having sex with her." Doe cried out to Morrow for help. Morrow walked into the room and asked Doe: "You want me too[?]" Doe replied "No" and Morrow left the room. At that point, she was alone with Taylor and Knox. One held her down and the other one raped her. "Somebody put a pillow over her head, and she didn't know who it was, and she didn't know who was having sex with her after that[,] . . . if it was still [Taylor] or [Knox] or both."

After Santa Cruz completed this testimony, the trial court informed the jury that the "testimony relative to what Jane Doe said in the presence of Miss Santa Cruz at the . . . sheriff's station . . . is admitted for the limited purpose of showing that a complaint was made by the victim. It is not being admitted for the truth of the matter asserted." Further, at the end of trial, the jury was instructed: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other." (CALCRIM No. 303.)

Defendants urge that Santa Cruz's testimony about Doe's statements to Deputy Sheriff Limpanukorn fell outside the boundaries of the fresh complaint doctrine because it repeated Doe's statements supplying multiple details to the crimes. We disagree.

For one thing, most of Santa Cruz's testimony repeated Doe's statements that Taylor had raped her. These statements fell well within the fresh complaint doctrine. (*People v. Burton, supra,* 55 Cal.2d at p. 351.) As for Knox, Cruz's testimony about Doe's statements to Deputy Sheriff Limpanukorn only identified Knox as a perpetrator: either as the rapist or aider and abettor who held her down while she was raped. These statements fell well within the fresh complaint doctrine. (*People v. Burton, supra,* 55 Cal.2d at p. 351.) And, as explained earlier, the references to Morrow were essentially exculpatory.

36

In any event, the trial court submitted a limiting instruction to the jury that it could not consider Doe's statements at the sheriff's statement for the truth of the matter asserted and reiterated that point in one of its closing instructions. Thus, to the extent that any of Santa Cruz's testimony about Doe's statements to Deputy Sheriff Limpanukorn exceeded the fresh complaint doctrine, we presume that the jury followed the court's limiting instructions and did not consider the statements for the truth of the matter asserted. (*People v. Mickey, supra,* 54 Cal.3d 612, 689, fn. 17.)

### d. *Forensic Nurse Examiner Beukes*

Defendants next contend that the trial court improperly permitted Nurse Beukes to testify about Doe's statements pursuant to the fresh complaint doctrine. For several reasons, we are not convinced that the fresh complaint doctrine was the basis of the nurse's testimony. For one thing, at the pretrial hearing, the prosecutor did not identify Nurse Beukes as one of the many witnesses she was considering calling to testify pursuant to the fresh complaint doctrine. In addition, at the close of trial, the trial court submitted the following limiting instruction to the jury, a fact defendants overlook. "Toyetta Beukes, R.N., testified that in reaching her conclusions as an expert witness, she considered statements made by Jane Doe. You may consider those statements only to evaluate the expert's opinion. *Do not consider those statements as proof that the information contained in the statements is true.*"[23] (Italics added.) Reviewing Nurse Beukes' testimony in this context (testimony we set forth below in detail), we believe she testified in her expert

---

[23] The trial court also submitted CALCRIM No. 332, the pattern instruction about evaluating the testimony of an expert witness.

capacity and, that to the extent that she testified to Doe's hearsay statements, it was solely to explain to the jury the basis of her expert opinion.

In any event, Nurse Beukes testified as follows. She performed a sexual assault examination on Doe on November 13. The protocol for the examination includes obtaining the facts of the sexual assault(s) from the victim. Doe identified the three defendants and Scooter as her assailants. Doe told Nurse Beukes the following. She and defendants wrestled. During the wrestling, Morrow "was biting her genitalia through her jeans." Then, each of the three defendants penetrated her vagina with his penis. At one point, Morrow "was kissing her mouth to try to shut her up." Knox "put his penis to her mouth but she was able to push . . . the penis away; however, it did make contact to [her] lips." One defendant put his "penis to her anal area, but she was not for sure which one because she was face down." In addition, one defendant "placed [a pillow] over her head and she was not able to breathe, but she was face down so she didn't know who" did it.

Assuming arguendo that this testimony was admitted pursuant to the fresh complaint doctrine, the bulk of it was proper. Nurse Beukes simply testified to Doe's statements that identified the crimes and assailants: each defendant raped her; Knox attempted oral copulation; and one of them attempted to sodomize her. To the extent that Nurse Beukes' testimony exceeded the boundaries of the fresh complaint doctrine because it included a few details of the crimes (wrestling, kissing and biting of Doe's genitalia through her jeans), the error in admitting it was non prejudicial for two separate reasons.

First, the jury is presumed to have followed the two limiting instructions submitted by the trial court. (*People v. Mickey, supra*, 54 Cal.3d at p. 689, fn. 17.) Second, as explained above in regard to Eboni White's testimony, Doe testified to the same facts, albeit in much more detail, and was subject to vigorous cross-

38

examination by defense counsel. Consequently, the jury "did not have to rely on [Doe's] secondhand statements to other people [including Nurse Beukes], but was able to hear her directly and judge her credibility." (*People v. Manning, supra*, 165 Cal.App.4th at p. 881.) Because the prosecutor *never* mentioned Nurse Beukes' testimony about Doe's statements in her closing or rebuttal arguments, Doe's credibility—not Beukes'—was the issue posed to the jury. And, as we explain below in our discussion of Deputy Sheriff Limpanukorn's "fresh complaint" testimony, this is not a closely divided case where erroneously admitted evidence would have improperly tipped the balance in favor of the People.

e. *Deputy Sheriff Limpanukorn*

Deputy Sheriff Limpanukorn testified that Doe came to the sheriff's station on November 13 to report the rape and told him the following. She went to the apartment in response to a text message she received from Morrow. When she arrived, Taylor, Knox and Scooter were present. Doe engaged in "horseplay" with Morrow in Taylor's bedroom. During that activity, Taylor entered the bedroom and also engaged "in horseplaying and wrestling." At some point, Taylor picked Doe up, carried her into the bathroom, placed her in the shower, and turned on the water. Thereafter, she drove Taylor and Morrow to Carl's Jr. to eat.

When the three returned to the apartment, Knox grabbed Doe and pushed her down on to a couch. Taylor held Doe from behind while Morrow and Knox fondled "her underneath her top." She loudly told the men to stop and struggled to free herself from Taylor's grip. Taylor "locked her legs with his legs and held her by both of her wrists" and tried to kiss her. Doe screamed: "Stop. Stop. Stop. . . . I got to go. You guys are being too sexual for me. This is not what I came here

39

for.  I have to leave."  Taylor released Doe and she ran into the bathroom and locked the door.

Morrow and Taylor entered the bathroom through a second unlocked door that Doe had not seen.  Doe's pants were down because she was inspecting her torn underwear.  Doe tried to pull up her pants but Taylor grabbed her arms, "held her wrists against the counter, and . . . was grinding his groin against her buttocks."  Doe yelled at Taylor to stop.  Taylor pulled her into his bedroom where he pushed her onto a mattress.  Morrow held her down by her arms.  Doe yelled:  "Stop.  Let go of me."  Taylor sat on Doe's legs, pulled down her underwear and inserted his fingers into her vagina.  Taylor unwrapped a condom.  Doe said:  "Stop.  Don't do this.  Let go of me."  Taylor proceeded to rape her while Morrow held her arms down.  Doe continually yelled at Taylor to stop.  After seven to eight minutes, Taylor stopped whereupon Knox raped Doe.  While Knox raped Doe, Taylor attempted to put his penis in her mouth but Doe pushed it way.  After awhile, Taylor and Knox switched positions; Taylor again raped Doe and Knox placed his penis on her lips.  At some point, Doe saw Morrow.  Morrow "had a guilty look on his face" and "walked out" of the room without sexually assaulting her.  After Morrow left the room, someone placed a pillow over Doe's face and she was "raped again" "several times."  She could not see the face(s) of her assailant(s).  Eventually, the pillow was taken off of Doe's face and she saw Scooter.  Someone tried to force her back down on the mattress.  She screamed:  "Stop it already."  The men stopped their actions and left the room.

Doe went into the bathroom.  Taylor followed her and said:  "We'll see you next time."  Doe replied:  "There won't be a next time."  Taylor responded:  "Well, thanks.  You had good pussy."  Doe pushed Taylor away and walked out of the bathroom.  Morrow handed Doe her car keys.  She walked out to her car with

40

Morrow. He said: "Don't blame anyone but yourself just because you feel ashamed now. It's your fault. You were the one being flirty. You asked for it."

Defendants correctly note, and the Attorney General concedes, that much of Deputy Sheriff Limpanukorn's testimony exceeded that allowed by the fresh complaint doctrine because it supplied multiple details of the crimes as well as describing antecedent and subsequent events. However, it is not reasonably probable that defendants would have obtained a more favorable result had this testimony not been admitted. (*People v. Manning, supra,* 165 Cal.App.4th at p. 880.) For one thing, the importance of Deputy Sheriff Limpanukorn's testimony about Doe's statements was diminished because his testimony was "consistent with and cumulative to [Doe's] trial testimony." (*Id*. at p. 881.) Further, the prosecutor never mentioned Deputy Sheriff Limpanukorn's testimony about Doe's statements in her closing and rebuttal arguments. Thus, the jury was not asked to rely on those extrajudicial statements to determine whether the sexual assaults occurred. Instead, the prosecutor argued primarily that Doe's testimony established defendants' guilt beyond a reasonable doubt. The jury heard Doe's testimony, observed her demeanor, and was able to judge her credibility. Because both defense counsel vigorously attacked Doe's credibility in their closing arguments, the jury was called upon to decide Doe's credibility, not the deputy's, in deciding guilt or innocence.

In addition, we reject defendants' argument that this was a "closely-balanced case" so dependent upon Doe's testimony that any inadmissible evidence improperly tilted the case in favor of the prosecution. As noted earlier, when the trial court denied defendants' new trial motions, sitting as the 13th juror, it found Doe to be credible. This credibility finding is supported in multiple ways. One, Scooter, cousin to Knox and Taylor, testified that when Doe left the apartment, she told defendants: "You guys don't know when 'no' means 'no'," evidence that

41

clearly suggests that the sexual encounter was not consensual. Two, Ocampo testified that shortly after the assaults, Doe told her that she had been raped by "Scooter and them," hearsay evidence that the trial court ruled was admissible as a spontaneous statement. Three, Nurse Beukes' expert opinion that her observations of Doe's physical condition and clothes were consistent with Doe's description of the sexual assaults buttressed Doe's credibility. And four, Doe's testimony about Morrow's threatening conduct after the assaults suggested consciousness of guilt on his part and was therefore additional evidence she had been raped.[24] In addition, the credibility of Taylor and Knox's trial testimony that Doe consented was undermined by their prior inconsistent statements, a point the prosecutor made in closing argument.[25]

Lastly, we reject defendants' argument that the other jury's acquittal of Taylor suggests that the case was so close that they were prejudiced by *any* inadmissible evidence. "'The fact that certain defendants may escape conviction for their crimes is not any legal or logical reason why another defendant, where substantial evidence has been introduced to sustain his conviction, should be exonerated and be permitted to escape punishment for his crime.' [Citation.] Accordingly, 'The general rule is that acquittal of one codefendant normally will not require acquittal of another.' [Citation.]" (*People v. Palmer* (2001) 24 Cal.4th 856, 861; see, in general, 6 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Criminal Judgment, §§ 88-89, pp. 131-132.) This rule has particular force when, as here, different juries that did not hear identical evidence reached different

---

**24** In closing argument, the prosecutor, relying upon a modified version of CALCRIM No. 371 ("Consciousness of Guilt: Suppression and Fabrication of Evidence") argued that Morrow's conduct was evidence of consciousness of guilt.

**25** CALCRIM No. 362 ("Consciousness of Guilt: False Statements") was submitted to the jury.

42

results.  And significantly, with the exception of Knox's attack on the sufficiency of the evidence to support his conviction for forcible oral copulation (a claim that we explain later lacks merit as a matter of law), defendants do not contend that substantial evidence does not support their convictions.

In sum, the error in permitting Deputy Sheriff Limpanukorn to testify to Doe's statements was harmless.

f.  *Cumulative Nature of the Testimony*

Lastly, defendants argue that the fresh complaint "evidence reached a unique level of redundancy. . . .  Between all the witnesses who testified as to what Doe said, this surely amounts to overkill."  As we now explain, this argument has been forfeited because defendants did not object at any point that the evidence would be or had become cumulative.  (Evid. Code, § 353, subd. (a).)

At the pretrial hearing, the prosecutor stated she intended to call three witnesses:  Eboni White, Ocampo and Deputy Sheriff Limpanukorn.  The defense never urged that testimony from these three individuals would be cumulative.  In fact, when the prosecutor stated that there were other witnesses (George White and Santa Cruz) she could, but, in all likelihood would not call because *she* was concerned that the evidence would become cumulative, defense counsel insisted that the prosecutor keep those witnesses on-call so that they could call them to testify.

When, during trial, the prosecutor called Santa Cruz as a witness to testify both to Doe's statements to Santa Cruz as well as Doe's statements to Deputy Sheriff Limpanukorn made in Santa Cruz's presence, defense counsel did not object that the evidence would be cumulative.  And when Nurse Beukes—a witness whom the prosecutor had not identified as testifying pursuant to the fresh complaint doctrine—began to testify to Doe's statements, the defense did not

43

object that the testimony was beyond the scope of the trial court's pretrial ruling or that it was cumulative.

The trial court "cannot commit error in the admission of evidence unless it is called upon to *rule* on an *objection* by a party." (*People v. Viray* (2005) 134 Cal.App.4th 1186, 1208.) The statutory codification of this principle in Evidence Code section 353, subdivision (a) "represents a specific application of the general rule that reviewing courts will not consider alleged deficiencies in a judgment or order unless the trial court was given an opportunity to act upon them in the first instance. [Citations.]" (*Id.* at p. 1209.) Here, had the defense specifically objected at any stage of the proceeding that the evidence was becoming cumulative, the trial court would have considered and ruled upon the objection. But defense counsel never interposed that objection. The failure to do so constitutes a forfeiture of the claim on appeal. (*People v. Rogers* (1978) 21 Cal.3d 542, 547.)

## C.  SUFFICIENCY OF THE EVIDENCE TO SUPPORT KNOX'S CONVICTION OF FORCIBLE ORAL COPULATION

Knox next contends that the evidence is insufficient to sustain his conviction for forcible oral copulation.[26] We disagree.

As set forth earlier, Doe testified that at one point during the sexual assaults, Taylor sat on her legs. At the same time, Knox sat in front of her and attempted to place his penis into her mouth. She closed her mouth and turned her head but Knox's penis came in contact with her lips. Knox, on the other hand, testified that he never placed his penis on Doe's lips.

---

[26]    Morrow was acquitted of this charge.

44

CALCRIM No. 1015 instructed the jury, inter alia: "Oral copulation is any contact, no matter how slight, between the mouth of one person and the sexual organ . . . of another person. Penetration is not required."

In convicting Knox of forcible oral copulation (§ 288a, subd. (d)(1)), the jury implicitly credited Doe's testimony and rejected Knox's version of the events. In this appeal, Knox does not challenge the jury's resolution of that evidentiary conflict. Instead, he contends that, even as accepted by the jury, Doe's testimony is insufficient to sustain his conviction because he "did not penetrate Doe's mouth with his penis, nor was there substantial contact between [his] penis and Doe's mouth." As we explain below, Knox's contention fails because he relies upon case law that the California Supreme Court explicitly disapproved in *People v. Dement* (2011) 53 Cal.4th 1 (*Dement*).

Section 288a, subdivision (a) defines oral copulation as "the act of copulating the mouth of one person with the sexual organ . . . of another person." In *Dement*, the court was called upon to decide whether "any contact, however slight, between the mouth of one person and the sexual organ . . . of another person constitutes oral copulation within the meaning of section 288a(a)." (*Dement, supra,* 53 Cal.4th at p. 42.) To decide that issue, *Dement* reviewed the language of the charging statute (it includes no requirement of penetration or substantial contact), decisions from the courts of appeal, and previously approved jury instructions. (*Id.* at pp. 41-43.) Further, *Dement* acknowledged that "the gravamen of the offense of oral copulation 'is the revulsion and harm suffered by one who is forced to unwillingly touch his or her mouth to the genitals of another.' [Citation.]" (*Id.* at p. 43.) Based upon all of those factors, *Dement* concluded that no "more than slight contact is required" to sustain a conviction under section 288a. (*Id.* at p. 42.) (See also 2 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Sex Offenses and Crimes Against Decency, § 36, p. 432 [*Dement* held that

the "crime is committed by any contact between the mouth of one person and the sexual organ of another; penetration of the mouth . . . is not required."].)

In light of *Dement* (a case that Knox fails to acknowledge),[27] Knox's contention must fail. Doe testified that Knox placed his penis on her mouth. Although she turned her head, his penis came in contact with her lips. This constitutes substantial evidence to support his conviction. Knox's reliance on *People v. Angier* (1941) 44 Cal.App.2d 417 to support a contrary conclusion is misplaced. *Dement* specifically disapproved that case as well as other court of appeal opinions that had required either a penile penetration of the mouth or substantial contact between the defendant's penis and the victim's mouth to sustain a conviction. (*Dement, supra*, 53 Cal.4th at p. 43, fn. 20.)

## D.  SUBMISSION OF A
## UNANIMITY INSTRUCTION

Defendants next contend that the trial court committed prejudicial error because it failed to give a unanimity instruction. Knox raised this contention in his opening brief, arguing: "[A]part from [count 4 – attempted forcible rape in concert], there were multiple acts that could have supported the offenses, and the jury did not know that it had to agree as to which act formed the basis for which count." Morrow, in his reply brief, joined in the contention, advancing the general argument that "it was not entirely clear about how the offenses were charged given the conflicting versions of Doe herself in reporting the offenses to authority. . . . Without a unanimity instruction, there is simply no way to know on the instant

---

[27]     Knox's opening brief and reply brief were filed, respectively, approximately three months and fourteen months after *Dement* was decided.

record whether the jurors agreed on a single act or acts." These arguments are not persuasive.

The trial court is required to submit sua sponte a unanimity instruction "where the evidence shows that the defendant has committed two or more similar acts, each of which is a separately chargeable offense, but the information charges fewer offenses than the evidence shows." (*People v. Sutherland* (1993) 17 Cal.App.4th 602, 611-612.) However, no unanimity instruction is required when the prosecution makes an election as to which act constitutes which count.[28] (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) The prosecution can make this election when it presents its opening statement by tying each count to specific acts to be shown by the evidence. (*People v. Diaz* (1987) 195 Cal.App.3d 1375, 1382.) The prosecutor's election must be communicated in a clear and direct manner so that "the jurors [are] informed of their duty to render a unanimous decision as to a particular unlawful act." (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1539.)

In this case, the prosecutor made the required election in her opening statement. First, she presented a detailed recitation of what she believed the evidence would show regarding defendants' sexual assaults of Doe.[29] Then, the prosecutor explained, in the following manner, how each count related to a specific incident she had set forth. First, the prosecutor discussed the only two crimes that jointly charged Taylor and Morrow: rape by foreign object in concert (count 1) and forcible rape in concert (count 2). These crimes were committed immediately after Taylor and Morrow forced Doe into Taylor's bedroom. As Morrow held Doe

---

[28]     Defendants' briefs do not discuss this settled principle of law.

[29]     The prosecutor's recitation conformed, in material respects, to Doe's subsequent testimony.

down, Taylor first digitally penetrated her and then raped her.[30]  Next, the prosecutor referred to the evidence that Knox raped Doe while Taylor held her down (count 3 – forcible rape while acting in concert).[31]  Count 4 charged all three defendants with attempted forcible rape while acting in concert.  The prosecutor explained this crime occurred when Morrow tried but failed to vaginally penetrate Doe as Knox held her down.[32]  Count 5 charged all three defendants with forcible oral copulation and was committed, as the prosecutor explained, when "Knox actually put his penis just past her [Doe's] lips."[33]  Counts 6 and 7 charged Knox and Taylor with forcible rape while acting in concert.  The prosecutor stated that "[t]hose last two charges refer[] to the events that occurred when the victim's head was covered by that pillow."[34]  Thus, because the prosecutor's opening statement elected which conduct by each defendant amounted to the crime charged, no unanimity instruction was required.  (See *People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1455.)

Furthermore, in the closing argument presented to the jury deciding the charges against Morrow and Knox, the prosecutor explained the charged counts in the same manner.  Count 1 occurred when Morrow "aided or abetted" Taylor in digitally penetrating Doe's vagina.  Counts 2 and 3 occurred when "the defendants" Morrow and Knox "either had or aided or abetted" Taylor "in acts of sexual intercourse with Jane Doe."  The charge of attempted forcible rape while

---

[30]  Morrow was convicted of counts 1 and 2.

[31]  Knox was convicted of count 3.

[32]  Both Morrow and Knox were convicted of count 4.

[33]  Knox was convicted of count 5 but Morrow was acquitted of the charge.

[34]  Knox was convicted of count 6 but acquitted of count 7.

48

acting in concert (count 4) occurred when Morrow "gets behind her [Doe] and tries to stick his penis in her vagina" while Knox was in front of her. Count 5 occurred when Knox tried to force his penis into Doe's mouth: "She's turning her head to try to avoid contact and still pushes his penis up against her mouth touching her lips. [¶] Any contact, however slight, without her consent between a penis and a mouth is oral copulation." Morrow the leaves the room "and that's when the pillow comes over her head and they continue raping her." (Counts 6 & 7.)

In sum, this is not a case where the prosecutor asked the jurors to select from among several discrete acts to convict defendants of the charged counts. Rather, the prosecutor repeatedly asserted—first in her opening statement and later in her closing arguments—that each count was committed by a specific act. The trial court therefore was not required to submit sua sponte a unanimity instruction.

## E. DEFENDANTS' REQUEST TO MODIFY THE PATTERN AIDING AND ABETTING INSTRUCTION

Defendants next contend that the trial court's refusal "to modify the standard CALCRIM aiding and abetting instruction[] to add the element of consent for the charged offenses was prejudicial error." We disagree.

### 1. *Factual Background*

In regard to each of the charged sex offenses, the pattern instructions informed the jury that in order to convict defendants, the prosecution had to prove lack of consent beyond a reasonable doubt. (CALCRIM Nos. 1000 [rape], 1015 [oral copulation], & 1045 [sexual penetration with a foreign object].) The jury was further instructed that defendants were "not guilty of rape [or forcible sexual penetration] if [they] actually and reasonably believed that the woman consented to the intercourse. The People have the burden of proving beyond a reasonable doubt

49

that [defendants] did not actually and reasonably believe that the woman consented." (CALCRIM No. 1000.)

In addition, the court explained to the jury: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. [¶] A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." (CALCRIM No. 400.) The court submitted CALCRIM No. 401, the pattern instruction explaining aiding and abetting. In pertinent part, it states: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime."

During a recess in the prosecutor's closing argument, defense counsel, *for the first time*, asked the trial court to modify the aiding and abetting instruction by incorporating into it the language about lack of consent found in the instructions defining the target offenses. Defense counsel opined that absent such a modification, their clients could be convicted on aiding and abetting theories even if the jury found that Doe had consented to the charged offenses. The trial court rejected the defense request. It reasoned that the instructions, taken together, adequately explained the pertinent law to the jury.

2. *Discussion*

Defendants contend that the trial "court's refusal to expand the definition of aiding and abetting to include the element of consent was improper" because "there was evidence presented from which the jury could conclude . . . Doe

50

consented to the offenses and [defendants] could not be found guilty of the 'in concert' sex offenses based on an aiding and abetting theory."

"[I]n assessing a claim of instructional error, we consider the entire charge to the jury, and not simply the asserted deficiencies in the challenged instruction." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 220.) Defendants do not disagree that the jury was correctly instructed about the elements of the charged sex offenses—including the requirement that the People prove beyond a reasonable doubt that the victim had not consented—as well as the law of aiding and abetting that includes the elements that the People prove beyond a reasonable doubt that the perpetrator committed a crime and the defendant knew that the perpetrator intended to commit a crime. In addition, the trial court instructed the jury to "[p]ay careful attention to all of these instructions and *consider them together*." (CALCRIM No. 200, italics added.) In light of the preceding instructions, it was not necessary for the trial court to modify CALCRIM No. 401 as requested by defense counsel. Further, both defense counsel argued that *no* crimes had been committed *because* Doe had consented. In sum, there was no reasonable likelihood that the jury would have misconstrued the instruction to mean that it could find defendants guilty on a theory of aiding and abetting without first finding that the People had established a crime had been committed because Doe had not consented to a particular sexual act. (See *People v. Thornton* (2007) 41 Cal.4th 391, 436.)

In a similar vein, we also reject defendants' argument that modification of the instruction was required because "[a]ssuming arguendo [that] the jury did *not* believe that Doe actually consented, it could reasonably have concluded from the totality of the evidence that Doe engaged in equivocal conduct which led [defendants] reasonably but mistakenly to believe she consented." Putting aside the fact that defendants fail to point to anything in the record to support this

speculative assertion, a contextual reading of CALCRIM No. 401 indicates that there is no reasonable likelihood that the jury could have reached such a conclusion. As set forth above, the instruction explained to the jury that in order to find any defendant liable on a theory of aiding and abetting, the jury was required to find that the defendant "*knew* that the perpetrator intended to commit the crime." (Italics added.) This means the jury was required to find that the defendant had no mistaken but reasonable belief that Doe had consented to the sexual assault committed by the perpetrator. The parties framed the issue in that manner in closing arguments. Defense counsel, in addition to claiming that Doe had consented, argued that in light of Doe's sexual comments to defendants, Doe's wrestling with defendants, and Doe's return to Taylor's apartment after leaving to eat, defendants reasonably believed that she consented to their sexual activities and were therefore not guilty of committing any crime. The prosecutor refuted this argument in her rebuttal. Consequently, the jury could not have found defendants guilty based upon the aiding and abetting theory if it had not been persuaded beyond a reasonable doubt that defendants did *not* reasonably but mistakenly believe Doe had consented but, instead, *knew* that the perpetrator intended to commit a non-consensual sexual assault.

## F.  PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT

Defendants next contend that the prosecutor committed several acts of prejudicial misconduct during closing argument. We are not persuaded.

### 1. *The Prosecutor Did Not Misstate the Law on Consent*

Citing several comments made by the prosecutor, defendants contend that she committed misconduct by "misstating the law on consent." We disagree.

First, defendants point to a brief portion of the prosecutor's argument made after she explained the legal definitions of fear and duress. The prosecutor urged: "[I]f Jane Doe found herself in a situation where she was overpowered by three men who, despite her efforts to get away [and to] stop [them], . . . they refused, and they continued to perpetrate sex acts upon her – *the fact that she at some point essentially gave up does not constitute consent*." (Italics added.)

Any claim of misconduct predicated upon this comment has been forfeited because defendants failed to object and request an appropriate admonition. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1095.) In any event, the statement was not misconduct but, in fact, a correct statement of the law. The prosecutor was not required to prove Doe "resisted" in order to convict defendants (*People v. Griffin* (2004) 33 Cal.4th 1015, 1024-1025) but, instead, was required only to prove that Doe did not consent and that defendants used force, fear or duress to commit the sexual assaults. Moreover, it is proper for a prosecutor to argue the distinction between consent and submission based upon fear or duress. "Actual consent must be distinguished from submission. For instance, a victim's decision to submit to an attacker's sexual demands out of fear of bodily injury is not consent [citations] because the decision is not freely and voluntarily made [citation]." (*People v. Giardino* (2000) 82 Cal.App.4th 454, 460, fn. 3.)

Second, defendants cite to the following comments by the prosecutor to which defense counsel did object:

> "What's the evidence of forcible rape? Again, the evidence is Jane Doe's sworn testimony. Jane Doe testified under oath that 'I did not give [Morrow, Taylor, or Knox] permission to stick a penis in my vagina.'

> "Out of all the salacious comments about Black cock and interracial sex that these defendants attributed to Jane Doe, did you hear one shred of evidence about any conversation, discussion, let

53

alone agreement about somebody sticking his penis in Jane Doe's vagina?

"There was no discussion about that. These was no agreement to that. There was only these salacious comments that they attribute to Jane Doe, none of which amount to consent and none of which amount to an agreement.

"So the evidence is there was no permission, and that's evidence from both sides. Jane Doe told you, 'I didn't give him permission.' There was not a shred of testimony from anyone who came to court that testified under oath, 'Jane Doe told me to put my penis in her vagina.'"

Defense counsel objected, and, at sidebar, sought declaration of a mistrial, arguing: "That is not the law. That is not part and parcel of the [consent] instructions. . . . There is nothing in the definition of consent that has anything to do with permission and/or agreement that it has to be an expressed agreement and/or expressed permission. It is not the law."

The trial court disagreed. It noted that during the argument, the prosecutor had placed an enlarged image of CALCRIM No. 1000 before the jury and that the instruction included the following definition: "To consent, a woman must act freely and voluntarily and know the nature of the act" and that the prosecutor had quoted verbatim from that definition. The trial court therefore ruled: "[The prosecutor] is within that definition in terms of the words that she used; that a person had knowledge of the act, specificity of the act, that the person gives freely and voluntar[ily] their [permission to] act. And that can be argued as permission, and it is argument. So she is within the bounds of argument. [¶] The motion for mistrial is denied."

The prosecutor's argument was not misconduct. Contrary to what defendants suggest, the prosecutor did not improperly tell the jury that consent

54

could be proven only by an oral agreement between Doe and one or more of the defendants; that consent could not be implied from the circumstances; or that a defendant's reasonable and good faith mistaken belief that the victim consented is not a defense. Instead, the prosecutor argued that there was no evidence of express consent. That argument was proper based upon the evidence and the law. In any event, counsel for Knox later argued (correctly) that express permission was not required by law and that consent could be implied by conduct.

The issue of consent arose again in the following colloquy.

> "[The Prosecutor]: Remember Traveon Taylor asking Jane Doe to drive her car? Now, had he not asked her to drive her car and had she not given him permission, he would have been committing the crime of unlawful driving of a vehicle. If he gets in her car without her permission and starts driving, he's committed that crime.
>
> "It's the same with – it's the same with sex crimes. If he asked – if he has to ask her to drive her car, why does he not have to ask her to put his penis in her vagina?
>
> "[Defense Counsel]: I'm going to object. That's not the jury instruction.
>
> "THE COURT: Ladies and gentlemen, the jury instruction on the issue of consent is as follows – and you will receive the instructions – to consent, a woman must act freely and voluntarily and know the nature of the act."

For the reasons stated above, this argument was not misconduct. Further, the trial court then correctly instructed the jury about the elements of consent, and as set forth below in footnote 35, the prosecutor used that definition to amplify her argument.[35]

---

[35] The prosecutor argued:

2. *The Prosecutor Did Not Refer to Facts Outside of the Evidence or Make Personal Attacks Upon Defense Counsel*

Next, defendants argue that the prosecutor referred to facts outside of the evidence and personally attacked their counsel. They rely upon the following portion of the prosecutor's argument made after she had recited much of the evidence against defendants:

> "[T]he slutification of a victim. Make her out to be a slut and a whore. Get you focused on that so that you don't – you don't focus on what the law is is that they have to have consent. [¶] So what do they do? They attribute salacious comments to the victim. They talk about how she said I love Black cock and I like interracial sex and I'm horny and I'm wet and all these disgusting salacious things that they attribute to her. They're trying to slutify her to get you focused on the fact that she's a slut and she doesn't deserve the protection of the law. [¶] Can we watch porn? They even suggest it was Jane Doe's idea."

Defense counsel objected, stating: "Your Honor, this is 352. I would object." The trial court stated: "Overruled. It's argument of the counsel."

---

"Freely and voluntarily and know the nature of the act. Can I drive your car? Yes, you may. That's freely and voluntarily and knowing the nature of the act. We know exactly what the nature of the act is. It's driving a car.

"Freely and voluntarily and knowing the nature of the act as it relates to sex is whatever sex act you want to perform on this woman's body. You have – she has to know the nature of the act. What do you want to do to me? Painting her as a slut and taking liberties that she hasn't given you does not give you consent.

"So that's what these defendants want you to believe; that they have to ask her to drive the car because that's specific and that clearly spells out the nature of the act, but they don't have to ask her to stick their penises in her vagina because she's a slut. She watched porn for five minutes. That's what these defendants want you to believe. That's Damien Morrow's defense.

"Damien Morrow did not have consent. There was no conversation between Jane Doe and Damien Morrow regarding any sexual activity."

56

Defense counsel's reference to Evidence Code section 352 is insufficient to preserve this claim for appeal. Counsel was required to specifically assign the statement as prosecutorial misconduct and to request a curative admonition. The failure to do so constitutes a forfeiture of the claim. (*People v. Tafoya, supra,* 42 Cal.4th 147, 176.)

In any event, we are not persuaded by defendants' argument which goes as follows. "These comments [of the prosecutor] were improper as the fact that defense counsel supposedly made up salacious comments about [Doe] and [Doe] was the person who had the idea of having interracial sex and watching the interracial pornographic video were not issues presented by the evidence introduced at trial."

The argument fails because the prosecutor's comments *were* supported by the evidence. Deputy Sheriff Limpanukorn testified that when he arrested Taylor four days after the assaults, Taylor had told him that Doe had acted flirtatious; that she "was egging it on and she said that she was horny"; and that she told him that "she couldn't turn down Black cock." Taylor testified that Doe had said that she "wanted to watch a porno" and that she liked "interracial sex." Knox testified in a similar vein, claiming that she asked him to play an "interracial porno" and told him "I love Black cock."[36] It is therefore apparent that the prosecutor was not improperly imputing comments to defense counsel but, instead, was commenting on the evidence and the apparent defense theory that because Doe had made these remarks, she had consented (implicitly or explicitly) to sexual relations with defendants. The prosecutor made this clear when, after the trial court overruled the defense objection, she continued:

---

[36] In opening statement, Knox' attorney stated: "[Doe] wanted to watch pornography. She asked for pornography. She specifically asked, 'Do you have interracial sex pornography?' You'll hear that she indicated 'I like Black cock.'"

"In [defendants'] mind, you don't need consent to stick your penis in a whore's mouth or vagina. That's why they slutify her. Because they want you to focus on the fact that she's a slut and that she doesn't deserve the protection of the law that everyone else in the state deserves; that she doesn't get to pick and choose who she wants to slut around with.

"Well, that's the reasoning of an offender. That is not the law. Even a prostitute can pick her Johns, and a promiscuous girl, if she is promiscuous, can pick and choose who she wants to be promiscuous with.

"Blaming the victim. You are being flirty. You wanted it. Don't blame anyone but yourself. You brought it on yourself. It's your fault. A person seeks to assign blame only when he's done something wrong and he knows it. That's the only time that you talk about blame."

It is well settled that the prosecutor may make fair comments upon the defense evidence and theory. None of the prosecutor's argument about the defense attempt to denigrate Doe's character and to ignore the issue of consent as defined by the law was improper. "An argument which does no more than point out that the defense is attempting to confuse the issues and urges the jury to focus on what the prosecution believes is the relevant evidence is not improper." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1302, fn. 47.) In light of that principle, we reject defendants' claim that "the prosecutor's comments improperly maligned [defense] counsel's character and inferred [*sic*] [their] defense was false, misleading, and contrived." (See also fn. 15, *infra,* for a discussion of additional comments that defendants erroneously claim constituted prosecutorial misconduct.)

3. *Defendants Have Forfeited the Claim that the Prosecutor's Comment About Knox Constituted Misconduct Because It Appealed to the Passion and Prejudice of the Jury*

In the course of arguing that Knox did not believe that he needed Doe's consent, the prosecutor stated:  "He's going to make his own determination about what somebody else wants, and he's going to proceed on that.  He's going to tell you what is inside somebody else's mind.  *That's the sex offender telling the victim that she liked it.*  Common.  Common.  *The sex offender telling the victim she liked it*."  (Italics added.)

The following colloquy then occurred:

"[Knox's attorney]:  I'm going to interpose an objection at this point in time.  This is misconduct.

"THE COURT:  Counsel, if your objection is misstates the evidence, I will sustain.

"[Knox's attorney]:  That's my objection.

"THE COURT:  The objection is misstating the evidence. Sustained."

Defendant Knox now urges that the prosecutor's comments appealed to the passion and prejudice to the jury and therefore constituted misconduct.  The argument fails for several reasons.  To begin, Knox abandoned his general claim of prosecutorial misconduct (a claim that never urged the comments appealed to the jury's passion and prejudice) when counsel agreed that the proper objection was that the prosecutor had misstated the evidence.  Further, to the extent that the prosecutor's comments *did* misstate the evidence (it was Taylor and Morrow but not Knox who essentially told Doe that she had enjoyed their sexual assaults), the court sustained the defense objection on that basis.  In addition, immediately

59

before closing arguments commenced, the trial court reminded the jury twice "that what the lawyers say during argument is not evidence" and explained: "You've heard all of the evidence here in court from the witness stand [and] [t]he exhibits." Lastly, the written instructions submitted to the jury reiterated that "Nothing that the attorneys say is evidence" and the attorneys' "remarks" in their "closing arguments" "are not evidence." (CALCRIM No. 222.) The jury is presumed to have followed these instructions. (*People v. Mickey, supra*, 54 Cal.3d at p. 689, fn. 17.) If Knox believed an admonition to the jury to explicitly disregard the remark was also necessary, it was his responsibility to request one. (*People v. Carter* (2005) 36 Cal.4th 1114, 1205.) Because such an admonition would have been sufficient to cure any harm from the comment, Knox has not preserved the issue for appeal. (*People v. Wallace, supra,* 44 Cal.4th at p. 1095; *People v. Tafoya, supra,* 42 Cal.4th at p. 176.)

To the extent that the prosecutor's statement that Knox was a sex offender could be construed as a statement Knox had previously been convicted of a sex offense, the comment did misstate the evidence. However, because the court sustained the defense objection and instructed the jury several times that counsel's statements were not evidence, Knox's failure to request an admonition constitutes a forfeiture of any appellate claim based upon that comment. (*People v. Carter, supra,* 36 Cal.4th at p. 1205.) But more to the point, there is no reasonable likelihood that the jury construed the comment in an objectionable fashion. Viewing the comment in a contextual and common sense manner, the more reasonable interpretation is that the prosecutor was simply referring to Knox as a sex offender because he was one of three individuals who committed multiple sex

offenses against Doe. In that case, the comment was more than amply supported by the record.[37]

## G. THE TRIAL COURT'S IMPOSITION ON MORROW OF CONSECUTIVE SENTENCES

Morrow contends that the trial court erred when, after selecting count 1 (rape by a foreign object) as the base term, it imposed consecutive sentences on count 2 (forcible rape) and count 4 (attempted forcible rape). He argues that there is insufficient evidence to support the trial court's finding that counts 2 and 4 occurred on separate occasions. We disagree.

### 1. *Factual Background*

We briefly recapitulate the facts underlying Morrow's conviction of three crimes, counts 1, 2 and 4. After Taylor and Morrow forced Doe into Taylor's bedroom, Morrow held her down as Taylor digitally penetrated her (count 1). Taylor stopped, retrieved a condom and placed the condom on his penis. Doe pled with Morrow for help but Morrow ignored her plea and continued to hold her down while Taylor raped her (count 2). After that, Knox entered the room. Knox raped Doe while Taylor held her down; Knox orally copulated Doe; and Taylor again raped Doe. Then, Morrow attempted to rape Doe as Knox held her down (count 4).

After the jury returned with its verdicts, the parties filed briefs addressing, inter alia, the propriety of imposing consecutive sentences. At the sentencing

---

[37] Although this specific claim of error was raised by Morrow, he has no standing to pursue it because the prosecutor's remarks referred only to Knox.

hearing, counsel again argued their positions. Thereafter, the trial court imposed sentence.

First, the court selected count 1 as the base term and imposed the low term of five years. It then turned to whether it should impose consecutive terms for counts 2 and 4. It reasoned:

"Mr. Morrow [had] a reasonable opportunity to reflect upon his particular actions. While Mr. Taylor [was] digitally penetrating the victim, Mr. Morrow was holding down the victim.

"Certainly during that period of time, he had the opportunity to reflect upon his subsequent actions. I should say he had a reasonable opportunity to reflect upon his subsequent actions. He had a conversation with the victim asking if this is what she wanted. She indicated 'no.' Whether or not she was sure, she was sure that was not what she wanted. . . .

"Mr. Taylor then gets a condom from the dresser area, opens up the packaging, puts it on and continues in his actions, and yet Mr. Morrow is still inquiring of the victim whether or not this is some activity that she is wanting. Her response is she does not want said activity.

"At some point in time, Mr. Morrow leaves the room and returns to the room, and at that time he starts to put his penis into the victim's vagina, and their eyes meet and he then retreated. The time that he was out of the room and coming back into the room and attempting what is just described, in this court's mind gave him a reasonable opportunity to reflect upon his actions. . . .

"So the court does find that these events and accounts occurred on separate occasions."

Based upon its findings, the court imposed consecutive sentences consisting of a five-year term on count 2 and 28-month term on count 4, for an aggregate sentence of 12 years and four months.

2. *Discussion*

Section 667.6, subdivision (d) provides for consecutive sentences for multiple sex offenses if the crimes "involve the same victim on separate occasions." The statute explains that "[i]n determining whether crimes against a single victim were committed on separate occasions . . . , the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his . . . actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his . . . opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions." (*Ibid.*)

A reviewing court will not overturn the trial court's finding of "separate occasions" unless no reasonable trier of fact could have concluded that the defendant had a reasonable opportunity to reflect. (*People v. Plaza* (1995) 41 Cal.App.4th 377, 384-385.) Applying this deferential standard, we uphold the trial court's finding.

Between the commission of count 1 (Taylor's digital penetration of Doe) and count 2 (Taylor's rape of Doe), several events occurred. Taylor retrieved a condom wrapper, opened it, and placed the condom on his penis. Doe, recognizing Taylor intended to rape her, appealed to Morrow for help. Morrow did nothing to assist her, but, instead, continued to hold Doe's arms down as Taylor raped her. On these facts, the trial court could reasonably find that Morrow had a reasonable opportunity to reflect upon his actions before he actively assisted Taylor's rape of Doe and that the acts therefore occurred on separate occasions for purposes of applying section 667.6, subdivision (d).

Between the commission of count 2 (Taylor's rape of Doe) and count 4 (Morrow's attempted rape of Doe), Doe was sexually assaulted multiple times after Knox entered the bedroom and Morrow "left". Knox raped Doe as Taylor held her down; Knox forced Doe to orally copulated him; and Taylor raped her again. After these events, Morrow—who Doe testified was "back in the room"—committed count 4 when he attempted to rape Doe. "That sequence of events afforded [Morrow] ample opportunity to reflect on his actions and stop his sexual assault, but he nevertheless resumed it." (*People v. Garza* (2003) 107 Cal.App.4th 1081, 1092.) Therefore, we conclude that the trial court did not err in imposing a consecutive sentence for count 4.

In sum, the record supports the trial court's imposition of consecutive sentences.[38]

---

[38] Morrow argues that *People v. Pena* (1992) 7 Cal.App.4th 1294 and *People v. Garza, supra,* 107 Cal.App.4th 1081 support his contention that "the sex acts did not occur on separate occasions." We disagree. Whether sexual assaults occurred on separate occasions is a fact-driven inquiry, specific to each case. (See *People v. Irvin* (1996) 43 Cal.App.4th 1063, 1070-1072.) Suffice it to note that we have examined the two cases that Morrow cites and conclude that neither supports his argument because each is factually distinguishable.

## DISPOSITION

The judgments are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

                    WILLHITE, Acting P. J.

We concur:

MANELLA, J.

SUZUKAWA, J.

65